## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| UFCW Local 1500 Welfare Fund on behalf of itself and all others similarly situated | : | CIVIL ACTION |
| v. | : : : | |
| Actavis Holdco U.S., Inc., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( X )

(f) Standard Management – Cases that do not fall into any one of the other tracks. ( )

| | | |
|---|---|---|
| | | Plaintiff UFCW Local 1500 Welfare Fund |
| 3/6/2017 | | |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-567-6565 | 215-568-5872 | pcosta@finekaplan.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UFCW Local 1500 Welfare Fund

**DEFENDANTS**
Actavis Holdco U.S., Inc., Teva Pharmaceuticals USA, Inc., Mylan Inc., Mylan Pharmaceuticals Inc., Endo International plc, Par Pharmaceutical, Inc., Heritage Pharmaceuticals Inc.,Breckenridge Pharmaceuticals, Inc. and Upsher-Smith Laboratories, Inc.

**(b)** County of Residence of First Listed Plaintiff   Nassau County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Morris County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Fine, Kaplan and Black, RPC
One South Broad Street, 23rd Floor
Philadelphia, PA 19107   215-567-6565

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question *(U.S. Government Not a Party)*
☐ 2  U.S. Government Defendant
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☒ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 1, 15(a)
Brief description of cause:
Violation of Sherman Act and Clayton Act

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE   Cynthia M. Ruth
DOCKET NUMBER   17-cv-144, 17-cv-535

DATE
03/06/3017

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 425 Merrick Avenue, Westbury, NY 11590

Address of Defendant: See Attachment A

Place of Accident, Incident or Transaction: United States

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes☐  No☒

Does this case involve multidistrict litigation possibilities?          Yes☒  No☐

*RELATED CASE, IF ANY:*
Case Number: 17-cv-144; 17-cv-535   Judge Cynthia M. Rufe   Date Terminated:

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☒  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Paul Costa , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 3/6/2017                                                      87750

Attorney-at-Law                                      Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 3/6/2017                                                      87750

Attorney-at-Law                                      Attorney I.D.#

CIV. 609 (5/2012)

**Addendum A**

| Defendant | Address |
|---|---|
| Actavis Holdco U.S., Inc. | Morris Corporate Center III<br>400 Interpace Parkway<br>Parsippany, NJ 07054 |
| Teva Pharmaceuticals USA, Inc. | 425 Privet Rd.<br>Horsham, PA 19044 |
| Mylan Inc. | 1000 Mylan Blvd.,<br>Canonsburg, Pennsylvania 15317 |
| Mylan Pharmaceuticals Inc. | 781 Chestnut Ridge Road<br>Morgantown, West Virginia 26505 |
| Endo International PLC | 1400 Atwater Dr.<br>Malvern, PA 19355 |
| Par Pharmaceutical, Inc. | One Ram Ridge Road<br>Chestnut Ridge, New York 10977 |
| Heritage Pharmaceuticals Inc. | 12 Christopher Way #300<br>Eatontown, New Jersey 07724 |
| Breckenridge Pharmaceuticals, Inc. | 1 Passaic Ave, Fairfield<br>New Jersey 07004 |
| Upsher-Smith Laboratories, Inc. | 6701 Evenstad Drive<br>Maple Grove, Minnesota 55369 |

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>ACTAVIS HOLDCO U.S., INC.; TEVA PHARMACEUTICALS USA, INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., ENDO INTERNATIONAL PLC, PAR PHARMACEUTICAL, INC., HERITAGE PHARMACEUTICALS INC., BRECKENRIDGE PHARMACEUTICALS, INC., and UPSHER-SMITH LABORATORIES, INC.,<br><br>*Defendants.* | Civil Action No.<br><br><br>CLASS ACTION COMPLAINT<br><br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff UFCW Local 1500 Welfare Fund, on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust laws to recover damages and obtain injunctive and equitable relief for the substantial injuries it and others similarly situated have sustained against Defendants arising from their conspiracy to raise the prices of and allocate markets and customers for generic propranolol hydrochloride tablets ("Propranolol Tabs") and propranolol hydrochloride extended-release capsules ("Propranolol ER Caps") in the United States. Plaintiff's claims arise from a set of conspiracies by numerous generic drug manufacturers, including Defendants here, to unlawfully fix, raise, maintain and stabilize the prices of more than a dozen generic drugs, including the one at issue in this Complaint. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## **NATURE OF THE ACTION**

2.      Propranolol hydrochloride is a commonly prescribed medication used to treat high blood pressure, chest pain (angina), and uneven heartbeat (atrial fibrillation). Significantly, this drug is not new: certain branded versions of Propranolol hydrochloride have been on the market for over 50 years, and generic versions have also been available for decades.

3.      In the pharmaceutical industry, the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn reduces prices for drug wholesalers, retail pharmacies, consumers, and third party payors. Defendants here, however, conspired to thwart the economic benefits of generic competition by agreeing to fix and raise prices and rig bids for, and allocate customers of, generic Propranolol ER Caps and Propranolol Tabs.

4.      Defendants orchestrated their conspiracy through secret communications and meetings, both in private and at public events, such as trade association meetings held by the Generic Pharmaceutical Association ("GPhA"), National Association of Chain Drug Stores, Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), Efficient Collaborative Retail Marketing, the National Pharmacy Forum ("NPF"), and the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), among others.

5.      Defendants here were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals. Defendants' anticompetitive conduct in the Propranolol ER Caps and Propranolol Tabs markets is part of a series of conspiracies involving at least a dozen generic drug manufacturers and as many as two-dozen generic drugs. Indeed, commenting on the scope of its current antitrust investigation, the Connecticut Attorney General George Jepsen stated that "[t]he issues we're investigating go ***way beyond*** the two drugs and six

companies [that are the subject of civil lawsuit brought by, at first 20, and now 40, state attorneys general]. ***Way beyond…We're learning new things every day***."[1]

6.      Defendants' and other generic manufacturers' conduct has grabbed the attention of government enforcers, members of Congress, the press, and drug purchasers. The Department of Justice's Antitrust Division ("DOJ") and the Connecticut Attorney General's Office ("CTAG")—which is leading a multi-state working group of state attorneys general—are conducting sweeping antitrust probes into allegations that generic drug manufacturers participated in conspiracies to fix prices and rig bids for, and allocate customers of, various generic drugs.

7.      Indeed, on December 12 and 13, 2016, the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.[2] DOJ alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline sold in the United States. Each was charged with two felony counts under the Sherman Act (15 U.S.C. §1). On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.

8.      Soon after the DOJ filed criminal charges, 20 state attorneys general also sued Aurobindo, Citron, Heritage, and Teva, as well as Mayne Pharma and Mylan for bid-rigging, price-fixing and customer allocation in connection with their sale of glyburide and doxycycline in the United States. More recently, the DOJ intervened in the civil antitrust action brought by direct-purchasers of propranolol in the Southern District of New York and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal

---

[1] Liz Szabo, et al., How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices, The Daily Beast (Dec. 21, 2016), http://thebea.st/2haV9xg.

[2] *United States v. Glazer*, No. 16-cr-506 (E.D. Pa. Dec. 12, 2016); *United States v. Malek*, No. 16-cr-508 (E.D. Pa., Dec. 13, 2016).

investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the informations that were unsealed."[3]  On March 1, 2017, the state attorneys general complaint was amended to, *inter alia*, add claims of an additional 20 state attorneys general, bringing the total number of state AGs prosecuting the action to 40.  The DOJ and AG filings stem from long-running investigations and the issuance, by a federal grand jury proceeding in the Eastern District of Pennsylvania, of subpoenas relating to price fixing in the generic drug industry.

9.      In addition to DOJ's and CTAG's investigations, members of Congress have written letters to generic manufacturers Actavis, Apotex, Impax, Lannett, Mylan, Par, Sun, Teva, West-Ward, and Zydus, requesting information concerning their sales of numerous generic drugs, including albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, and benazepril/hydrochlorothiazide.

10.      The ongoing civil and criminal investigations could also result in the imposition of substantial fines against many generic drug manufacturers, including those named as Defendants here. One analyst has estimated, for example, that Defendant Teva could face liability of between $300 million and $700 million, while Mylan could face liability of between $380 million and $770 million. Another analyst estimated that fines industry-wide could exceed $1 billion.[4]

---

[3] *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, 16 CV 09901 (JSR), 17 CV 00078 (JSR), 17 CV 00980 (JSR) 17 CV 01039 (JSR), February 21, 2017 Tr. at 10, 11.

[4] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

11.     As a result of Defendants' scheme to rig bids, fix and maintain prices for, and allocate customers of, generic Propranolol ER Caps and Propranolol Tabs, consumers and third-party payors paid, and continue to pay, supracompetitive prices for these generic drugs.

12.     Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is composed of all individuals and entities in the United States or its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for (i) Propranolol ER Caps, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 20, 2013 through the present; and (ii) Propranolol Tabs, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 9, 2015 to the present.

13.     The second class (the "Damages Class") is composed of all individuals and entities who, in Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia, indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for (i) Propranolol ER Caps, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 20, 2013 through the present; and (ii) Propranolol Tabs, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 9, 2015 to the present.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief and costs of suit, including attorneys' fees, against Defendants for the injuries that Plaintiff and the other members of the Injunctive Class have suffered from Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26, because this action arises under the federal antitrust laws. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000 and at least one member of the Damages Class is a citizen of a state different from that of one of Defendants.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

18.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

19.     Defendants sold and shipped Propranolol ER Caps and Propranolol Tabs in a continuous and uninterrupted flow of interstate commerce. The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate and intrastate commerce.

- 6 -

20.     Each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

## THE PARTIES

### A.     Plaintiff

21.     Plaintiff UFCW Local 1500 Welfare Fund ("**Local 1500**") is an employee welfare benefits fund with its principal place of business at 425 Merrick Avenue, Westbury, New York, 11590. Local 1500 provides nearly 23,000 members with health and welfare benefits, many of whom live in New York, among other states. Local 1500 purchased and paid for some or all the purchase price for Propranolol ER Caps and Propranolol Tabs, thereby suffering injury to its business and property. Local 1500 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

### B.     Defendants

#### 1.     Teva Defendants

22.     Defendant Actavis Holdco U.S., Inc. ("**Actavis**") is a corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Actavis from Allergan plc's for $40.5 billion. In connection with this acquisition, Allergan assigned certain assets of its "generics business" to Actavis, so that by acquiring Actavis, Teva also acquired Allergan's generics business. Actavis sells Propranolol ER Caps and Propranolol Tabs in the United States.[5]

23.     Defendant Teva Pharmaceuticals USA, Inc. ("**Teva USA**") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva USA's

_____

[5] As part of the asset acquisition, Teva agreed to divest its rights to propranolol to Impax Laboratories Inc. https://www.ftc.gov/system/files/documents/cases/160915teva-allergan-table.pdf.

parent corporation is Teva Pharmaceutical Industries, Ltd., an Israeli corporation with its

principal place of business in Petach Tikva, Israel. Teva USA sells Propranolol ER Caps and

Propranolol Tabs manufactured by PLIVA, a Croatian subsidiary of Teva Pharmaceutical

Industries, Ltd.

24.     Together Defendants Actavis and Teva USA are referred to as "**Teva**."

**2.     Mylan Defendants**

25.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of

business in Canonsburg, Pennsylvania. The parent corporation of Mylan Inc. is Mylan N.V., a

Netherlands corporation with global headquarters in Hertfordshire, United Kingdom, and in

Canonsburg, Pennsylvania.

26.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its

principal place of business in Morgantown, West Virginia.

27.     Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are together referred to as

"**Mylan**." Mylan sells Propranolol ER Caps and Propranolol Tabs in the United States.

**3.     Endo Defendants**

28.     Defendant Endo International PLC ("**Endo International**") is an Irish

corporation with its principal place of business located in Dublin, Ireland and United States

headquarters in Malvern, Pennsylvania.

29.     Defendant Par Pharmaceutical, Inc. ("**Par**"), is a Delaware corporation with its

principal place of business in Chestnut Ridge, New York.  In September 2015, Endo

International acquired Par, merged it with Qualitest, and renamed the segment Par

Pharmaceutical, an Endo International Company.

30.     Defendants Endo International and Par are together referred to as "**Endo**." Endo

sells Propranolol Tabs in the United States.

### 4.   Heritage

31.   Defendant Heritage Pharmaceuticals Inc. ("**Heritage**") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage sells Propranolol Tabs manufactured by IPCA Laboratories.

### 5.   Breckenridge

32.   Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey. Breckenridge sells Propranolol ER Caps in the United States.

### 6.   Upsher-Smith

33.   Defendant Upsher-Smith Laboratories, Inc. ("**Upsher-Smith**") is a Minnesota corporation with its principal place of business in Maple Grove, Minnesota. Upsher-Smith sells Propranolol ER Caps in the United States.

34.   Defendants Teva, Mylan, Endo, Heritage, Breckenridge, and Upsher-Smith are referred to collectively as "**Defendants**."

35.   All Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged in this Complaint, and were authorized, ordered, or done by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, or with the actual, apparent, or ostensible authority of Defendants.

36.   Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## GENERIC DRUGS REDUCE PRESCRIPTION DRUG COSTS
## <u>TO PATIENTS AND THIRD-PARTY PAYORS</u>

37.     When generic versions of a branded drug—whether a generic manufactured and sold by an independent generic manufacturer or an "authorized generic," or "branded generic," sold by or pursuant to an agreement with the branded manufacturer—enter the market, they quickly gain substantial market share.

38.     Empirical studies have shown that within a year of generic entry, generics typically will have obtained about 90% of the market, *i.e.*, pharmacists will fill 90 of every 100 prescriptions with a generic. Indeed, according to IMS Health data, generic drugs as a whole have increased the share of total prescriptions steadily since 2004, and as of 2013, account for 86% of all drugs dispensed in the United States.[6]



---

[6] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.

39.     When generic drugs are launched, they are typically priced below the prices of their branded counterparts. Indeed, in a competitive market, each successive generic product that enters the market lowers the prices of all similar generic products because each entry increases competition for sales and market share. A Food and Drug Administration ("FDA") study demonstrates this effect in the following chart:[7]



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

40.     More recent evidence obtained by the GAO suggests that each subsequent generic entrant drives the price down by 20%.

41.     A Federal Trade Commission study confirmed the FDA's analyses, finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[8]

42.     Thus, generic competition to even a single brand drug can potentially provide billions of dollars in savings to consumers, pharmacies, and other drug purchasers, as well as to

---

[7] FDA, Generic Competition and Drug Prices, http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm129385. htm.

[8] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.

private health insurers, health and welfare funds, and state Medicaid programs, which reimburse

the cost of drug purchases by covered individuals. Indeed, one study found that the use of

generic medicines saved the U.S. healthcare system $254 billion in 2014 alone, and $1.68 trillion

between 2005 and 2014.[9]

43.     These consumer welfare-enhancing attributes of generic drug competition were

bolstered by the enactment of the Drug Price Competition and Patent Term Restoration Act of

1984, more commonly known as the "Hatch-Waxman Act." The Hatch-Waxman Act simplifies

the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and

selling generic drugs. Instead of filing a lengthy and costly New Drug Application ("NDA"), the

Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited

fashion through the filing of an Abbreviated New Drug Application ("ANDA").

44.     If an ANDA applicant shows that the generic drug is bioequivalent to the brand

drug, then the ANDA applicant may rely on scientific and other data compiled in the brand

drug's NDA, including safety and efficacy data. The ability to rely on the scientific data

published in the referenced brand drug's NDA obviates the need for duplicative and expensive

experimentation and clinical trials. The FDA must approve an ANDA unless the information

submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman Act.

45.     In connection with the approval of a generic drug, the FDA will assign a

"Therapeutic Equivalence Code" ranging from "AA" to "BX." An "AB" rating signifies that the

approved generic product is therapeutically equivalent to its branded counterpart. An AB rating

is significant because under state generic drug substitution laws, pharmacists are permitted—and,

in many cases, required—to substitute the branded product for its cheaper generic counterpart.

---

[9] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015),
http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

Moreover, in about 20 states, non-AB rated generic drugs can be substituted for their branded counterparts subject to certain considerations, including informed consent from patient or physician and whether the switch is appropriate in a pharmacist's professional judgment.[10] This inures to the financial benefit of consumers and third-party payors.

46.     In sum, the streamlined approval process under the Hatch-Waxman Act makes it easier for generic drug manufacturers to bring competing and cheaper generic products to market.

## THE PROPRANOLOL MARKET

47.     Propranolol hydrochloride is a beta-blocker whose therapeutic properties have been known since at least 1964.[11] Propranolol hydrochloride comes in two primary formulations: Propranolol ER Caps (generic Inderal® LA) and Propranolol Tabs (generic Inderal®). Propranolol ER Caps are sold in 60mg, 80mg, 120mg, and 160mg dosages. Propranolol Tabs are sold in 10mg, 20mg, 40mg, 60mg, and 80mg dosages. Both formulations are indicated to treat high blood pressure, chest pain (angina), and uneven heartbeat (atrial fibrillation). In addition to treating cardiac and circulatory ailments, both have been indicated for the prevention (prophylaxis) of migraines due to its ability to relax blood vessels.[12]

48.     At one time, there were over a dozen generic manufacturers of propranolol hydrochloride. Since then, however, the market has consolidated considerably, with only Defendants here still manufacturing and selling Propranolol ER Caps and Propranolol Tabs to drug purchasers in the United States.

---

[10]

http://pharmacistsletter.therapeuticresearch.com/pl/ArticleDD.aspx?nidchk=1&cs=&s=PL&pt=2&segment=1186&dd=220901&AspxAutoDetectCookieSupport=1.

[11] B.N.C. Prichard, et al., *Use of Propanolol (Inderal) in Treatment of Hypertension*, The British Med. J., Vol. 2, at 725-27 (1964), *available at*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1815864/?page=1#.

[12] https://migraine.com/migraine-treatment/propranolol-inderal/.

**DEFENDANTS' WRONGDOING**

49.     As part of their conspiracy, Defendants agreed to raise the prices of Propranolol Capsules and Propranolol Tablets sold in the United States.

50.     A recent article in the American Journal of Health-System Pharmacy noted that there have been "massive price increases" on propranolol hydrochloride.[13] One report noted that Propranolol prices have been "skyrocket[ing]" leaving many older Americans unable to pay for this essential medicine.[14]

51.     Over a six month period starting in late 2013, the price of Propranolol Capsules increased an average of 173%. Over a six month period starting in early 2015, the price of Propranolol Tablets increased an average of 736%.

**Propranolol ER Caps**

52.     Beginning in December 2013, Defendants caused the price of Propranolol ER Caps to dramatically increase in unison. The increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Propranolol ER Caps in the United States. The agreement was furthered by discussions held at GPhA meetings, including a meeting in Bethesda, Maryland in October 2013 that was attended by Defendants, as well as other meetings and communications.

53.     Defendants Mylan, Actavis, Breckenridge, and Upsher-Smith sold Propranolol ER Caps between December 18, 2013 and the present. Within a few weeks of the October 2013 meeting, average prices for Propranolol ER Caps increased an average of *173%* across dosage strengths, as seen in the price chart and graphs below. Propranolol ER Caps pricing data in the

---

[13] Schumeck et al., National trends in prescription drug expenditures and projections in 2016, 73 Am. J. Health-Syst. Pharm. 357, 370 (July 16, 2016).

[14] Melody Petersen, Drug costs skyrocket for many older Americans, despite Medicare coverage, Los Angeles Times (Nov. 23, 2016), available at http://www.latimes.com/business/lafi-medicare-drug-costs-20161123-story.html.

chart and graphs below is derived from the Centers for Medicare and Medicaid Services'

("CMS") National Average Drug Acquisition Cost ("NADAC") database. These prices increases

seen below were, for the most part, in lockstep.

| Propranolol ER Caps Dosage | Time Period | Average Price Increase |
|---|---|---|
| 60mg ER capsules | December 18, 2013 to July 23, 2014 | 164% |
| 80mg ER capsules | December 18, 2013 to September 17, 2014 | 174% |
| 120mg ER capsules | December 18, 2013 to July 23, 2014 | 181% |
| 160mg ER capsules | December 18, 2013 to October 22, 2014 | 174% |









54.  The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic propranolol capsule products:

(a)    **60 mg Capsules – 100 Capsule Bottle**



(b)     **80 mg Capsules – 100 Capsule Bottle**



(c)      **120 mg Capsules – 100 Capsule Bottle**



(d)      **160 mg Capsules – 100 Capsule Bottle**



**Propranolol Tabs**

55.     Beginning in February 2015, Defendants caused the prices of Propranolol Tabs to dramatically increase in unison.  The increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Propranolol Tabs in the United States. The agreement was furthered by discussions held at GPhA meetings, including a meeting in Miami Beach, Florida in February 2015 that was attended by Defendants, as well as other meetings and communications.

56.     Defendants Mylan, Actavis, Teva, Endo, and Heritage sold Propranolol Tabs between February 18, 2015 and the present. Prior to February 2015, the average amount paid for Propranolol Tabs in the United States was stable. However, within a few weeks of the February 2015 meeting, average prices for Propranolol Tabs increased an average of *736%* across dosage strengths, as seen in the chart below. As with the Propranolol ER Caps prices above, the prices for Propranolol Tabs is derived from CMS's NADAC database.  These price increases were, for the most part, in lockstep.

| Propranolol Tab Dosage | Time Period | Average Price Increase |
|---|---|---|
| 10mg tablet | February 18, 2015 to September 23, 2015 | 819% |
| 20mg tablet | February 18, 2015 to November 18, 2015 | 892% |
| 40mg tablet | February 18, 2015 to August 19, 2015 | 914% |
| 60mg tablet | February 18, 2015 to August 19, 2015 | 96% |
| 80mg tablet | February 18, 2015 to November 18, 2015 | 958% |











57.     The following charts display the per-unit amounts that Medicaid has reimbursed

for its beneficiaries' purchases of Defendants' generic propranolol tablets:

(a)     **10 mg Tablets – 100 Tablet Bottle**



(b)    **10 mg Tablets – 1000 Tablet Bottle**



(c)    **20 mg Tablets – 100 Tablet Bottle**



(d)    **20 mg Tablets – 1000 Tablet Bottle**



(e)     40 mg Tablets **– 100 T**ablet Bottle



(f)     40 mg Tablets **– 100**0 Tablet Bottle



(g)    **60 mg Tablets – 10**0 Tablet Bottle



(h)    80 mg Tablets – 100 Tablet Bottle



(i)    80 mg Tablets – 500 Tablet Bottle



58.    Medicaid reimbursement rates are typically the average wholesale price (AWP) minus a pre-determined percentage or the wholesale acquisition cost (WAC) plus a predetermined percentage. Elevated Medicaid reimbursement rates, therefore, reflect elevated AWP and/or WAC prices. Both AWP and WAC are list prices for prescription drugs used throughout the pharmaceutical industry. WAC and AWP serve as pricing benchmarks for Medicaid and across the pharmaceutical industry. Increased WAC and AWP result in elevated retail prices paid by end-payors, including Plaintiffs and members of the proposed classes.

*************

59.    Defendants' conduct cannot be explained by normal competitive forces. Rather, Defendants sustained these supracompetitive profits by conspiring to rig bids, fix, raise, and maintain the prices of, and allocate markets and customers for, Propranolol ER Caps and

- 32 -

Propranolol Tabs. The price increases were the product of Defendants' shared desire to extract monopoly rents from captive drug purchasers.

60.     In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale of Propranolol ER Caps and Propranolol Tabs in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Propranolol ER Caps and Propranolol Tabs sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to allocate customers for Propranolol ER Caps and Propranolol Tabs sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Propranolol ER Caps and Propranolol Tabs sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

(f)     Selling Propranolol ER Caps and Propranolol Tabs in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Propranolol ER Caps and Propranolol Tabs sold in the United States at collusive and noncompetitive prices.

61.     The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

62.     As a result of Defendants' unlawful agreement to restrain trade, Plaintiff and members of the Classes were injured because they paid, and continue to pay, supracompetitive prices for Propranolol ER Caps and Propranolol Tabs sold in the United States during the periods: (1) February 20, 2013 through the present for Propranolol ER Caps; and (2) February 9, 2015 through the present for Propranolol Tabs.

## THE GENERIC MARKETS FOR PROPRANOLOL TABLETS AND CAPSULES ARE SUSCEPTIBLE TO A PRICE-FIXING CONSPIRACY

### A.     Factors Supporting the Existence of a Conspiracy in the Propranolol ER Caps and Propranolol Tabs Markets

63.     The structure and other characteristics of the market for Propranolol ER Caps and Propranolol Tabs make it conducive to collusion and price-fixing. Specifically, the Propranolol ER Caps and Propranolol Tabs markets exhibited: (1) high barriers to entry; (2) inelasticity of demand; (3) a high degree of commoditization; (4) a high degree of concentration; (5) competitors acting against their economic self-interest; and (6) opportunities to conspire.

### 1.     There Are High Barriers to Entry in the Markets for Generic Drugs, Including Propranolol Tabs and ER Caps

64.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

65.     The Propranolol ER Caps and Propranolol Tabs markets have high barriers to entry.

66.     Even though Propranolol ER Caps and Propranolol Tabs are not protected by any patents, regulatory hurdles and the costs of doing business make market entry difficult, time consuming, and expensive. Any generic drug manufacturer seeking to enter the Propranolol ER Caps and Propranolol Tabs markets must file an ANDA and receive FDA approval.

67.     To file an ANDA, the generic manufacturer must show that the generic product is bioequivalent to its branded counterpart and invest considerable resources in the development of production lines capable of making the drug. Historically, the cost of filing an ANDA is about $1 million.[15] A generic manufacturer's production facilities must also meet Current Good Manufacturing Practice, which increase the costs of production.

68.     Moreover, a generic manufacturer that cannot produce the Active Pharmaceutical Ingredient ("API") for Propranolol ER Caps and Propranolol Tabs must have a reliable and affordable source of API for these products.

69.     Prospective generic manufacturers must also be able to satisfy FDA regulations and guidance governing bioequivalence and bioavailability of Propranolol ER Caps and Propranolol Tabs. This requires showing that the proposed generic Propranolol ER Caps and Propranolol Tabs have, among other things, the same therapeutic qualities and absorption profiles as their branded counterparts.

70.     The failure to meet all FDA requirements concerning manufacturing, testing, and labeling of Propranolol ER Caps and Propranolol Tabs will result in the FDA delaying (or denying) approval of an ANDA. These delays can last for months or even years.

-----

[15] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), at 7.

71.     Even if a non-conspiring generic manufacturer were to see an opportunity to compete on price regarding Propranolol ER Caps and Propranolol Tabs, due to the fact that the FDA's review of ANDAs is currently significantly "backlogged," any potential entrant would necessarily be delayed for years.[16] Indeed, the FDA has stated that as of fiscal year 2015, ANDA approvals can take 40 months or more.[17]

### 2.     Demand for Propranolol ER Caps and Propranolol Tabs Is Inelastic

72.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

73.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

74.     Demand for Propranolol ER Caps and Propranolol Tabs is highly inelastic because it is a unique product for which there are no reasonable substitutes.

75.     Propranolol hydrochloride, the active ingredient in both Propranolol ER Caps and Propranolol Tabs, is a unique compound that is not therapeutically equivalent to other treatments.

---

[16] *Id.* at 7.

[17] GAO, *Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases*, No. 16-706, at 26 (Aug. 2016), http://www.gao.gov/assets/680/679022.pdf.

76.     Branded versions Propranolol ER Caps and Propranolol Tabs do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.

77.     Thus, purchasers of Propranolol ER Caps and Propranolol Tabs are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 3.     Propranolol ER Caps and Propranolol Tabs Is a Commodity Product

78.     When products are subject to commoditization, producers of those products are usually forced to compete on price, as opposed to other factors, such as quality and ancillary services. When price becomes a significant factor in driving demand for a product, producers of a commoditized product have an easier time colluding on price than other non-price factors because price-based collusion is much easier to implement and monitor.

79.     Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. Indeed, state laws require that pharmacists substitute available AB-rated generic drugs for their branded counterparts precisely because of their lower price. Defendants' Propranolol ER Caps and Propranolol Tabs are AB-rated generics to their branded counterparts, enabling substitution.

80.     Moreover, because generic manufacturers generally spend little effort advertising or detailing their generic compounds (*i.e.*, the practice of providing promotional materials and free samples to physicians), the primary means for one generic manufacturer to differentiate its product from another generic competitor's product is through price reductions.[18] The need to

---

[18] *See* Congressional Budget Office, Promotional Spending for Prescription Drugs, Economic & Budget Issues Brief (Dec. 2, 2009), at 1.

compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

> **4.     The Generic Propranolol ER Caps and Propranolol Tabs Market Is Highly Concentrated**

81.     A concentrated market is more susceptible to collusion and other anticompetitive practices.

82.     The Propranolol ER Caps and Propranolol Tabs markets are highly concentrated, with only about a handful of companies—Defendants here—controlling each market.

83.     With few competing manufacturers in the market, Defendants are easily able to coordinate pricing of their respective products. This concentration also made it easy for them to monitor prices in the downstream market and police deviations from agreed-upon prices.

84.     As the dominant players in the Propranolol ER Caps and Propranolol Tabs markets, Defendants were able to fix, raise, and maintain their prices on these products without competitive threats from rival generic drug manufacturers.

> **5.     Defendants' Pricing of Propranolol ER Caps and Propranolol Tabs Was Against Their Self-Interest**

85.     Competitive firms in a competitive, commoditized marketplace will typically price their products aggressively, relative to their competitors' products. Firms price aggressively with the understanding that if they do not do so, other competitors will undercut their relatively high price, taking sales—and ultimately market share—away from the firms that are pricing less aggressively.

86.     Here, however, rather than attempt to take sales, revenue, and market share away from one another, Defendants instead sought to meet the price increases made by others and extract supracompetitive prices from Plaintiff and members of the Classes.

87.     Such conduct was against each Defendant's self-interest because rather than cut prices to gain sales, revenues, and market share, each Defendant instead sought to sacrifice these potential gains in favor of cartel pricing. Defendants' individual failures to cut prices in the face of price increases from competitors suggest that Defendants were conspiring to fix and raise prices, rather than competing on price.

### 6.     Memberships in the Same Trade Associations Provided Defendants with Opportunities to Conspire

88.     To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these meetings occurred primarily through (1) trade association meetings and conferences, and (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers.

### (a)     Trade Association Meetings and Conferences

89.      Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Propranolol ER Caps and Propranolol Tabs,  and how to allocate markets and customers for Propranolol ER Caps and Propranolol Tabs, including, but not limited to, GPhA, the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association (now known as the Healthcare Distribution Alliance) ("HDMA"), Efficient Collaborative Retail Marketing ("ECRM"), the National Pharmacy Forum ("NPF"), and the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP")..

90.     *GPhA:* GPhA is the largest trade association for generic and biosimilar manufacturers. Defendants and their senior executives are active members of the GPhA. For example, a number of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods.   For example, a number of Defendants' high-

ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods:

(a)     2012 Board of Directors: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Government and Public Affairs for Teva; Doug Boothe, President and CEO of Actavis; and Jeffrey Glazer, CEO of Heritage;

(b)     2013 Board of Directors: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Global Government Affairs and Public Policy for Teva; Jeffrey Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis;

(c)     2014 Board of Directors: Jeffrey Glazer, CEO of Heritage; Tony Mauro, President of Mylan North America; and Allan Oberman, President and CEO of Teva Americas Generics;

(d)     2015 Board of Directors: Debra Barrett, Sr. VP Global Government Affairs for Teva; Jeff Glazer, CEO of Heritage; Marcie Mcclintic Coates, VP & Head of Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals;

(e)     2016 Board of Directors: Debra Barrett, Sr. VP Global Government Affairs for Teva; Heather Bresch, CEO of Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

91.     GPhA Board Members include Mylan's Heather Bresch, Par's Tony Pera, and Teva's Debra Barrett.  In fact, Mylan's Heather Bresch serves as the current GPhA Chair of GPhA's Board of Directors. Representatives of Defendants frequently attend GPhA sponsored

events and conferences. Defendants' representatives attended many meetings held by GPhA, including the following between 2013 and 2015:

| Meeting | Meeting Date and Location | Attendees |
|---|---|---|
| 2013 GPhA Fall Technical Conference | October 28 to 30, 2013 Bethesda, Maryland | Teva, Mylan, Endo, Heritage, Breckenridge, Upsher-Smith |
| 2014 GPhA Annual Meeting | February 19 to 21, 2014 Orlando, Florida | Teva, Mylan, Endo, Heritage, Breckenridge, Upsher-Smith |
| 2014 GPhA CMC Workshop | June 3-4, 2014 Bethesda, Maryland | Teva, Mylan, Endo, Heritage, Breckenridge |
| 2014 GPhA Fall Technical Conference | October 27 to 29, 2014 Bethesda, Maryland | Teva, Mylan, Endo, Heritage, Breckenridge, Upsher-Smith |
| 2015 GPhA Annual Meeting | February 9 to 11, 2015 Miami, Florida | Teva, Mylan, Endo, Heritage, Breckenridge, Upsher-Smith |
| 2015 GPhA CMC Workshop | June 9 to 10, 2015 Bethesda, Maryland | Teva, Mylan, Endo, Heritage, Breckenridge |

92.    *NACDS:* NACDS is a national trade association representing chain community pharmacies. Its members include drug manufacturers, wholesalers, and retail chain pharmacies. Defendants Teva, Mylan, Breckenridge, Endo, and Upsher-Smith are members of NACDS. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic manufacturers attended, including the annual Total Store Expo.

93.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)    **Actavis:** Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics);

(b)    **Breckenridge:** Larry Lapila, President;

(c)    **Heritage:** Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President), Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

(d)    **Mylan:** Mike Aigner, Director National Accounts; Kevin McElfresh, Executive Director National Accounts; Joe Duda, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O 'Neill, Head of Sales; Lance Wyatt, Director National Accounts;

(e)    **Par:** Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Karen O' Connor, Vice President National Accounts; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles " Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager;

(f)    **Teva:** Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N .A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Allan Oberman, President and CEO Teva Americas Generics;

(g) **Upsher-Smith:** Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management.

94. On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a) **Actavis:** Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

(b) **Breckenridge:** Larry Lapila, President; Brian Guy, Vice President, Business Development; Martin Schatz, Senior Vice President, Sales;

(c) **Heritage:** Jeffrey Glazer (then CEO and Chairman);

(d) **Mylan:** Joe Duda, President; Tony Mauro, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales;

(e) **Par:** Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor Generic Sales;

(f) **Teva:** Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Allan Oberman, President and CEO Teva Americas Generics;

(g) **Upsher-Smith:** Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management; Mark Evenstad, CEO; Rusty Field, President.

95. *HDMA*: HDMA is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000

pharmacies, hospitals, long-term care facilities, and clinics.[19] HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members include Defendants Teva, Breckenridge, Endo, Par, Mylan, and Upsher-Smith as well as certain of their employees.[20]

96.     HDMA's Business and Leadership Conference ("BLC") purports to be the healthcare distribution industry's signature annual conference, developed by and for healthcare supply chain leaders and innovators. Exclusive to HDMA member companies, the conference brings together high-level executives, thought leaders and influential managers from across the healthcare supply chain to hold strategic business discussions on the most pressing industry issues. BLC meetings provided Defendants opportunities to collude in "one-on-one" meeting areas. Indeed, the daily schedule for each day of the multi-day BLCs sets aside several hours for "one-on-one business appointments."

97.     On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona. The President and CEO of HDMA bragged that over 3,100 one-on-one business appointments were held.[21]  The June 1-4, 2014 BLC was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

        (a)     **Upsher-Smith:** Scott Hussey, Senior Vice President, Sales; Jim Maahs, Vice President, Commercial Portfolio Management; JoAnn M. Gaio, Senior National Account Manager, Consumer Health; Brad Leonard, Senior Director, National Accounts; Michael McBride, Vice President, Partner Relations;

---

[19] https://www.healthcaredistribution.org/about.

[20] http://www.healthcaredistribution.org/about/membership/manufacturer/manufacturer-members.

[21] https://www.healthcaredistribution.org/news/ceo-perspective-2014-07-09-legislation-addressing-prescription-drug-abuse-on-the-move.

(b)  **Actavis:** Anthony Giannone, Executive Director, Sales; Marc Falkin, Senior Vice President Sales, U.S. Generics;

(c)  **Mylan:** Richard Issac, Senior Manager, Strategic Accounts; Lance Wyatt, Director, National Accounts;

(d)  **Heritage:** Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director National Accounts;

(e)  **Par:** Lisa Walker, Director, Distribution and Customer Service;

(f)  **Teva:** Theresa Coward, Senior Director, Sales and Trade Relations; Jessive Peters, Director, Trade Relations.

98.  *ECRM*: ECRM is a broad-based trade association that includes not only stakeholders from the medical and pharmaceutical industry, but other industries as well. ECRM's primary mission is "to strengthen the business practices of our clients by offering Efficient Program Planning Sessions (EPPS) that are supported by innovative technology solutions."[22] Within ECRM, however, there are discrete programs and conferences dedicated solely to distribution and sales of generic pharmaceutical products. For example, each year, ECRM holds a "Retail Pharmacy Generic Pharmaceuticals Efficient Program Planning Session." Attendees have included representatives from Defendants Teva, Breckenridge, Heritage, Endo, Par, Mylan, and Upsher-Smith.[23]

99.  *NPF*: NPF is an annual meeting co-hosted by Healthcare Supply Chain Association and the Healthcare Industry Supply Chain Institute. On February 16-18, 2015 the NPF took place at the Marriott Waterside Hotel & Marina in Tampa Florida.  At the February 2015 NPF, speaker topics included a "keynote" discussion on "unsustainability in

---

[22] https://ecrm.marketgate.com/AboutECRM/.

[23] https://ecrm.marketgate.com/Events/Attendees.aspx?s=3610&rt=S; https://ecrm.marketgate.com/Events/Attendees.aspx?s=3188&rt=S.

pharmaceutical pricing."  The 2015 NPF was attended by the following representatives from

Defendants, who were key executives for generic drug sales and pricing:

        (a)      Actavis: John Fallon, Executive Director, Sales;

        (b)      Breckenridge: David Giering, Manager, Marketing and Trade Relations;

        (c)      Mylan: Lee Rosencrance, District Manager; Martin Wingerter, Director of

National Accounts; Jan Bell, Director of National Accounts; Heather Paton, VP at Institutional

Sales; Mark Pittenger: Sr. Director of National Accounts;

        (d)      Teva: Nick Gerebi: Director, National Accounts; Jeff McClard, Sr.

Director, National Accounts; Cam Bivens, Director, National Accounts; Brad Bradford, Director,

National Accounts.

      100.    ***MMCAP***: MMCAP is a "free, voluntary group purchasing organization for

government facilities that provide healthcare services. MMCAP has been delivering pharmacy

and healthcare value to members since 1985. MMCAP's membership extends across nearly every

state in the nation, delivering volume buying power. Members receive access to a full range of

pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza

vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods

processing."

      101.    MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of

Administration, an agency of the State of Minnesota, began a cooperative purchasing venture

program to procure pharmaceutical products at the best price possible for the benefit of any other

state interested in participating in the program .... In 1996, the cooperative purchasing venture was

named Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) and currently provides

healthcare-related contracting to state and local government members located across the United

States of America. Total purchasers by MMCAP member facilities for all MMCAP programs exceed $1 billion annually ...."

102.     Representatives of Defendants Breckenridge, Mylan, Teva, Actavis and Heritage are all currently involved in MMCAP.

103.     As uncovered in the state attorneys' general investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers. These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

(b)     <strong>Private Meetings, Dinners, and Outings</strong>

104.     In addition to trade association meetings and events, Defendants, and other generic manufacturers often participated in smaller group dinners and other private meetings. A large number of generic drug manufacturers, including nearly all Defendants here, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.

105.     As uncovered by the state attorneys' general investigation, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

106.     Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners. During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information. Several different GNOs were held in 2015, including: (1) at the ECRM conference in February; (2) in Baltimore, Maryland in May, and (3) at the NACDS conference in August.

### GOVERNMENT INVESTIGATIONS INTO GENERIC DRUG PRICING

**A.     DOJ and State Attorneys General File Their First Complaints Alleging That Generic Drug Manufacturers Conspired to Fix Prices, Rig Bids, and Allocate Customers and Markets**

107.     On December 12 and 13, 2016, the DOJ filed its first charges in connection with its two-year investigation into collusion in the generic pharmaceuticals industry. DOJ charged former Heritage Pharmaceutical executives Jeffrey Glazer and Jason Malek each with two felony counts under the Sherman Act, for conspiring with others to fix prices, rig bids, and allocate customers for doxycycline and glyburide. According to reports, Messrs. Glazer and Malek are cooperating with DOJ's continued investigation.[24]

108.     The DOJ alleged that Glazer and Malek conspired with others to fix prices and rig bids for, and allocate customers of, doxycycline at least as early as April 2013 and continuing through at least December 2015. The DOJ also alleged that both conspired with others to fix prices and rig bids for, and allocate customers of, glyburide at least as early as April 2014 and continuing through at least December 2015. On January 9, 2017, Glazer and Malek pleaded guilty to the charges.

---

[24] Tom Schoenberg, David McLaughlin, and Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), http://bloom.bg/2hNRrpb.

109.     Soon after the DOJ filed criminal charges, 20 state attorneys general sued generic drug manufacturers Aurobindo Pharma, Citron Pharma, Heritage, Mayne Pharma, Mylan, and Teva for their scheme to rig bids and fix and maintain prices for, and allocate customers of, doxycycline and glyburide. According to their complaint, the state attorneys general have uncovered collusive conduct involving "numerous different drugs and competitors, which will be acted upon at the appropriate time."[25] On March 1, 2017, the state attorneys general complaint was amended to, *inter alia*, add claims of an additional 20 state attorneys general, bringing the total number of state AGs prosecuting the action to 40.

110.     The state attorneys general allege that Heritage acted as a "ringleader" conspiring with other companies on a wide range of drugs. These conspiracies were orchestrated and maintained through frequent meetings and communications between each conspirator's sales executives. As alleged above, the conspirators met at trade shows, conferences, and outings sponsored by numerous trade associations. In addition to these public events, the state attorneys general alleged that the conspiring generic manufacturers held private industry dinners and outings, including GNOs alleged above.

**B.     Ongoing Federal and State Antitrust Investigations into Generic Drug Pricing**

111.     The complaints filed by the DOJ and state attorneys general are just the beginning, and their respective investigations continue. Several generic drug manufacturers, including Defendants Actavis, Teva, Mylan, and , Par have received subpoenas or requests for information concerning their pricing of generic drugs, as well as their communications with their competitors for those drugs.

---

[25] Compl. at ¶ 9, *Connecticut v. Aurobindo Pharma USA, Inc.*, 16-cv-02056 (D. Conn., filed Dec. 14, 2016).

112.    Initial reports suggest that, at the beginning, the probes were focused on two generic drugs: digoxin and doxycycline. However, recent news reports have confirmed the sweeping nature of the DOJ's investigation: at least two-dozen drugs and a dozen drug companies are under criminal investigation.

113.    A federal grand jury investigating the matter is empaneled in the Eastern District of Pennsylvania. The result of these investigations could result in the imposition of substantial fines and criminal pleas for generic manufacturers, and jail time for company executives. Some analysts have estimated that the DOJ could impose fines in excess of $1 billion.[26]

114.    To date, the following generic drug companies have been contacted in connection with both federal and state antitrust probes:

115.    **Mylan.** Mylan similarly disclosed in a 2016 SEC filing that it received a subpoena from DOJ "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products."[27] Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[28]

116.    More recently, on November 10, 2016, Mylan disclosed that DOJ issued a subpoena to Mylan and certain employees and senior management "seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors

---

[26] Eric Saonowsky, *DOJ's price-fixing investigation could lead to sizable liabilities, analyst says*, FiercePharma (Nov. 10, 2016), http://www.fiercepharma.com/pharma/doj-s-price-fixing-investigation-could-lead-to-sizable-liabilities-analyst-says.

[27] Mylan, SEC 2015 Form 10-K, at 160.

[28] *Id.*

about such products."[29] Significantly, Mylan disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[30]

117.    *Par.* The federal grand jury's probe continues to expand. In an SEC Form 10-K for 2014, Par disclosed that it had received a subpoena from DOJ "requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products."[31] Moreover, in that same filing Par revealed that the CTAG served a subpoena on Par on August 6, 2014 "requesting documents related to our agreement with Covis Pharma S.a.r.l. to distribute an authorized generic version of Covis's Lanoxin® (digoxin) oral tablets."[32] Par stated that it completed its response on October 28, 2014.

118.    *Actavis.* Actavis's parent Allergan plc also disclosed in public filings that they received subpoenas from DOJ. Allergan reported that, on June 25, 2015, Actavis received a subpoena from DOJ "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[33]

119.    *Teva.* On August 4, 2016, Teva disclosed that "[o]n June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva

---

[29] Mylan SEC Form 10-Q, at 58 (Nov. 10, 2016), http://apps.shareholder.com/sec/viewerContent.aspx?companyid=ABEA-2LQZGT&docid=11678486#MYL10Q_20160930XDOC_HTM_S582E80BDD4215D11A4040D12D4C2E297.

[30] *Id.*

[31] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K, at 37.

[32] *Id.*

[33] Allergan, SEC 2015 Form 10-K, at F-106.

USA's generic products and communications with competitors about such products."[34] In that same filing, Teva disclosed that on July 12, 2016, "Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."[35]

120.    *Impax.* In July 2014, Impax disclosed in received a subpoena from the CTAG concerning Impax's sales of generic digoxin and whether it agreed with others to fix prices or allocate customers or territories. In November 2014, Impax disclosed that it also received a federal grand jury subpoena requesting testimony and documents about "any communication or correspondence with any competitor about the sale of generic drugs."[36] The scope of the subpoenas was not limited to a particular drug or a particular timeframe.

121.    Later, Impax further disclosed that on March 13, 2015, "the Company received a grand jury subpoena from the Justice Department requesting the production of information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular the Justice Department's investigation currently focuses on four generic medications: digoxin, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[37]

122.    *Lannett.* In July 2014, Lannett revealed in SEC filings that they had received subpoenas from the CTAG in connection with its investigation into whether "anyone engaged in a contract, combination or conspiracy in restraint of trade or commerce which has the effect of

---

[34] Teva, SEC Form 6-K at 25 (Aug. 4, 2016),
http://ir.tevapharm.com/phoenix.zhtml?c=73925&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExM DcyODU1JkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

[35] *Id.*

[36] Impax SEC Form 8-K (Nov. 6, 2014),
https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[37] Impax, SEC 2015 Form 10-K, at F-53.

(i) fixing, maintaining or controlling prices of digoxin or (ii) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law."[38]

123.    The information and documents sought by the CTAG included: (1) the identification of "all persons at Lannett with any supervisory, executive or other significant non-ministerial responsibility related to the pricing or sale of Digoxin"; (2) the identification and production of "all documents or communications referring or relating to any decision(s), by you or any other company, to increase the price of Digoxin"; (3) the production of "[a]ll marketing plans, strategic plans or any other documents relating to the development, manufacture and commercialization of Digoxin"; and (4) the identification and production of "written compliance policy directed to the antitrust laws."

124.    *Sun.* On or about May 28, 2016, Sun disclosed that it had received a subpoena from DOJ "seeking information about the pricing and marketing of the generic drugs it sells in the United States."[39] DOJ also sought documents related to "employee and corporate records and communications with competitors."[40]

125.    *Dr. Reddy's*. On or about August 11, 2016, Dr. Reddy's disclosed in an SEC filing that it had received a subpoena from the DOJ on July 6, 2016, "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any

---

[38] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html; Lannett Receive Inquiry from Connecticut Attorney General, http://finance.yahoo.com/news/lannett-receives-inquiry-connecticut-attorney-153300612.html.

[39] India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing, Fortune (May 28, 2016), http://fortune.com/2016/05/28/sun-pharma-drug-price-subpoena.

[40] *Id.*

communications with competitors about such products."[41] In that same filing, Dr. Reddy's

disclosed that it had received a subpoena from the CTAG concerning the same matters.

126.   **Citron.** On December 21, 2016, ACETO Corporation, a company which recently

purchased Citron's generic assets in December 2016, disclosed that the "Antitrust Division of the

U.S. Department of Justice executed a search warrant against the Company and also served a

subpoena requesting documents and other information concerning potential antitrust violations in

the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ."[42] ACETO also disclosed

that in September 2016, the CTAG requested that Citron produce all documents produced to

DOJ.

127.   **Mayne.** In its 2016 Annual Report, Mayne Pharma Ltd. disclosed that it was "one

of numerous generic pharmaceutical companies to receive a subpoena form the Antitrust

Division of the US Department of Justice [] in the last two years seeking information relating to

marketing, pricing and sales of select generic drugs."[43] In the same Annual Report, Mayne

Pharma also disclosed that it had received a subpoena from the CTAG seeking similar

information.

128.   **Taro.** On September 9, 2016, Taro disclosed that on September 8, 2016, it and

two senior officers in Taro's commercial team, "received grand jury subpoenas from the United

States Department of Justice, Antitrust Division, seeking documents relating to corporate and

employee records, generic pharmaceutical products and pricing, communications with

---

[41] Dr. Reddy's, SEC Form 6-K (Aug. 31, 2016).
[42] Aceto Corp., SEC Form 8-K, Ex. 99.5.
[43] Mayne Pharma, 2016 Annual Report, at 75.

competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[44]

129.    **Zydus.** Although Zydus is not publicly traded in the United States and thus not subject to reporting requirements under federal securities laws, recent press reports have stated the Zydus is also a target of the DOJ's sweeping investigation.[45] According to one article, Zydus is being investigated in connection with its marketing and sale of divalproex ER.[46]

### C.    Congressional Investigations into Generic Drug Pricing

130.    As news reports have proliferated with respect to the dramatic rise in price of certain generic drugs, members of Congress have expressed a growing concern as to what is driving these price hikes. On October 2, 2014, Representative Elijah E. Cummings, the Ranking Member of the House Committee on Oversight and Government Reform, and Senator Bernard Sanders, Chairman of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, "sent letters to 14 drug manufacturers requesting information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses."[47]

131.    These letters were delivered to the heads of Mylan, Actavis, Apotex, Dr. Reddy's, Impax, Par Pharmaceutical, Teva, Zydus, Endo, Heritage Pharmaceuticals, and Marathon

---

[44] Taro, SEC Form 6-K (Sept. 9, 2016), http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTExMTM0MjUwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDRElPTl9FTlRSJUkUmc3Vic2lkPTU3.

[45] Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India, http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

[46] *Hillary win may pose pricing challenges for pharma cos: Report*, F. World (Nov. 7, 2016), http://www.firstpost.com/world/hillary-win-may-pose-pricing-challenges-for-pharma-cos-report-3093544.html.

[47] Ranking Members Cummings and Chairman Sanders Investigate Staggering Price Increases for Generic Drugs, http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

Pharmaceuticals, seeking information about the pricing of divalproex ER, pravastatin, digoxin, doxycycline, albuterol sulfate, glycopyrrolate, neostigmine methylsulfate, benazepril/ hydrochlorothiazide, Isuprel® (isoproterenol hydrochloride), and Nitropress® (nitroprusside).

132.　Each letter stated:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community of Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients['] and pharmacies['] ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients."[48]

133.　In addition to sending letters to the generic drug manufacturers listed above, Senator Sanders and Representative Cummings wrote a joint letter to Sylvia Burwell, the Department of Health and Human Services Secretary, stating, "The federal government must act immediately and aggressively to address the increasing costs of these drugs."[49]

134.　The Senate Subcommittee on Primary Health and Aging held a hearing on November 20, 2014. Although the Presidents and CEOs of Lannett, Teva, and Marathon Pharmaceuticals were scheduled to attend the hearing, none appeared. Many panelists agreed that

---

[48] *See, e.g.*, Ltr. from Sen. Bernard Sanders & Rep. Elijah E. Cummings to Arthur P. Bedrosian (Oct. 2, 2014), http://www.sanders.senate.gov/download/letter-to-mr-bedrosian-president-and-ceo-lannett-company-inc?inline=file (citing Letter from B. Douglas Hoey to Sen. Tom Harkin, et al. (Jan. 8, 2014), https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf)).

[49] Congressional Panel to Probe Generic Drug Price Hikes (Nov. 11, 2014), http://www.sanders.senate.gov/newsroom/press-releases/congressional-panel-to-probe-generic-drug-price-hikes.

reduced competition across various generic drugs has contributed to the price hikes observed in the overall market.

135.    Subsequent congressional hearings concerning the dramatic rise of generic drug prices were held in December 2015 and February 2016. At the U.S. Senate Special Committee on Aging's December 9, 2015 hearing, Erin D. Fox, PharmD Director of the Drug Information Service of the University of Utah, noted the deleterious effect these drug prices have had on patient access and healthcare, stating, "When medication prices increase in an unpredictable and dramatic way, this can create an access issue for hospitals and patients. If hospitals cannot afford to stock a product in the same amount due to price increases, this effectively creates a shortage."[50]

136.    On February 24, 2015, Senator Sanders and Representative Cummings wrote to Daniel R. Levinson, the Inspector General of the Department of Health and Human Services, imploring the department to "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[51] On April 13, 2015, Inspector General Levinson responded to Senator Sanders and Representative Cummings's letter, stating that his office planned "to update our previous review of generic drug price increases under the Medicaid drug rebate program."[52]

---

[50] Statement of Erin R. Fox, PharmD Director, Drug Information Service, Hearing on "Sudden Price Spikes in Off-Patent Drugs: Perspectives from the Front Lines" (Dec. 9, 2015), at 7, http://www.aging.senate.gov/imo/media/doc/SCA_Fox_12_9_15.pdf.

[51] Letter from Hon. Bernard Sanders and Elijah Cummings to Hon. Daniel Levinson (Feb. 24, 2015), http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[52] Letter from Hon. Daniel Levinson to Hon. Bernard Sanders (Apr. 13, 2015), http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

## ANTITRUST IMPACT

137.     During the relevant period, Plaintiff and members of the Classes purchased substantial amounts of Propranolol ER Caps and Propranolol Tabs indirectly from Defendants. As a result of Defendants' illegal conduct, these purchasers have paid, and continue to pay, artificially inflated prices for Propranolol ER Caps and Propranolol Tabs. The prices paid were substantially higher than the prices that Plaintiff and members of the Classes would have paid absent the illegal conduct alleged in this Complaint.

138.     As a consequence, purchasers of Propranolol ER Caps and Propranolol Tabs have sustained substantial losses and damage to their business and property in the form of overcharges—and their losses continue to date. The full amounts, forms, and components of such damages will be calculated after discovery and upon proof at trial.

139.     Defendants' efforts to restrain competition in the market for Propranolol ER Caps and Propranolol Tabs have substantially affected intrastate and interstate commerce—and continue to do so.

140.     At all material times, Defendants manufactured, promoted, distributed, and sold substantial amounts of Propranolol ER Caps and Propranolol Tabs in a continuous and uninterrupted flow of commerce throughout the United States. Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase because, among other things, consumers and third-party payors within each state were forced to pay supracompetitive prices for Propranolol ER Caps and Propranolol Tabs.

141.     At all times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the sale of Propranolol ER Caps and Propranolol Tabs.

142.   Economists recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Professor Herbert Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.[53] He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."[54]

143.   The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Propranolol ER Caps and Propranolol Tabs to Plaintiff and members of the Classes.

144.   Defendants' anticompetitive conduct enabled Defendants to charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent Defendants' unlawful actions.

145.   The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

146.   The inflated prices that Plaintiff and members of the Classes have paid for Propranolol ER Caps and Propranolol Tabs, and continue to pay, are traceable to and the foreseeable result of, the overcharges by Defendants.

**CLASS ALLEGATIONS**

147.   Plaintiff brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(2), on behalf of itself and a nationwide class of similarly situated individuals seeking injunctive and equitable relief:

---

[53] *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice*, at 564 (1994).

[54] *Id.*

**The Injunctive Class**:

All persons or entities in the United States and its territories who indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for (i) Propranolol ER Caps, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 20, 2013 through the present; and (ii) Propranolol Tabs, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 9, 2015 to the present.

148.    Plaintiff also brings this action as a class action, under Fed. R. Civ. P. 23(a) and (b)(3), on behalf of itself and a class of similarly situated individuals seeking damages arising from Defendants' conduct as described below:

**The Damages Class**:

All persons or entities who in Alabama, Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia indirectly purchased, paid, and provided reimbursement for some or all of the purchase price for (i) Propranolol ER Caps, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 20, 2013 through the present; and (ii) Propranolol Tabs, other than for resale, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, from at least as early as February 9, 2015 to the present.

149.    The following persons and entities are excluded from the above-described Classes:

(a)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)    All governmental entities, except for government-funded employee benefit plans;

(c)      All persons or entities who purchased Propranolol ER Caps and
Propranolol Tabs for purposes of resale or directly from Defendants or their affiliates;

(d)      Fully-insured health plans (plans that purchased insurance from another
third-party payor covering 100% of the plan's reimbursement obligations to its members);

(e)      Flat co-payers (consumers who paid the same co-payment amount for
brand and generic drugs); and

(f)      The judges in this case and any members of their immediate families.

150.    Members of the Classes are so numerous that joinder is impracticable. Plaintiff
believes that there are thousands of members of each Class.

151.    Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff
and members of the Classes were damaged by the same wrongful conduct by Defendants in that
they paid artificially inflated prices for Propranolol ER Caps and Propranolol Tabs as a result of
Defendants' wrongful conduct—and continue to do so.

152.    Plaintiff will fairly and adequately protect and represent the interests of the
Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of
the Classes.

153.    Plaintiff is represented by counsel with experience in the prosecution of class
action antitrust litigation, and with experience in class action antitrust litigation involving
pharmaceutical products.

154.    Questions of law and fact common to the members of the Classes predominate
over questions that may affect only individual members of the Classes because Defendants have
acted on grounds generally applicable to each member of the Injunctive Class and Damages
Class.

155.    Questions of law and fact common to members of both Classes include:

(g)    the identity of the participants in the conspiracy;

(h)    whether Defendants conspired to fix, raise, maintain, and stabilize the prices of Propranolol ER Caps and Propranolol Tabs;

(i)    whether Defendants conspired to rig bids for Propranolol ER Caps and Propranolol Tabs;

(j)    whether Defendants conspired to allocate markets or customers with respect to the Propranolol ER Caps and Propranolol Tabs;

(k)    whether Defendants' conduct harmed competition in the Propranolol ER Caps and Propranolol Tabs markets;

(l)    whether Defendants' activities alleged herein have substantially affected interstate and intrastate commerce;

(m)    whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Plaintiff and members of the Classes in the nature of overcharges;

(n)    the amount of overcharges paid by Plaintiff and members of the Classes in the aggregate; and

(o)    the injunctive and other equitable relief needed to end Defendants' restraint and to restore competition in the Propranolol ER Caps and Propranolol Tabs markets.

156.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through

the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

157.    Plaintiff knows of no special difficulty to be encountered in this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Violation of Sherman Act § 1, 15 U.S.C. § 1**
**(By Plaintiff and Injunctive Class Members Against All Defendants)**

158.    Plaintiff incorporates the preceding paragraphs by reference.

159.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to rig bids and fix, raise, and maintain, the prices of, and allocated customers and markets for, Propranolol ER Caps and Propranolol Tabs—and continue to do so.

160.    Had Defendants competed instead of conspiring to restrain trade, Plaintiff and Injunctive Class Members would have paid substantially lower prices for Propranolol ER Caps and Propranolol Tabs.

161.    Defendants intended, and accomplished, a bid-rigging, price-fixing conspiracy and horizontal customer and market allocation for Propranolol ER Caps and Propranolol Tabs, which are *per se* violations of Section 1 of the Sherman Act. By their agreement, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and Injunctive Class Members paid artificially inflated prices for Propranolol ER Caps and Propranolol Tabs—and continue to do so.

162.     Plaintiff and Injunctive Class Members have suffered harm, and are continuing to suffer harm, as a result of paying higher prices for Propranolol ER Caps and Propranolol Tabs than they would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreements. Plaintiff and Injunctive Class Members also face a continuing threat of injury from the unlawful conduct alleged in this Complaint.

163.     Plaintiff and Injunctive Class Members have purchased substantial amounts of Propranolol ER Caps and Propranolol Tabs indirectly from Defendants.

164.     Plaintiff and Injunctive Class Members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that Defendants' conduct violates Section 1 of the Sherman Act.

165.     Plaintiff and Injunctive Class Members also seek equitable and injunctive relief, including disgorgement of profits, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to ensure that the same or similar anticompetitive conduct does not reoccur in the future.

<u>**SECOND CLAIM FOR RELIEF**</u>

**State Antitrust Violations**
**(By Plaintiff and Damages Class Members Against All Defendants)**

166.     Plaintiff incorporates the preceding paragraphs by reference.

167.     Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme to rig bids and fix, raise, and maintain, the prices of, and allocated customers and markets for, Propranolol ER Caps and Propranolol Tabs—and continue to do so.

168.     Defendants' unlawful conduct harmed Plaintiff and Damages Class Members in the manner explained above.

169.    Defendants' unlawful conduct covered a sufficiently substantial percentage of the relevant market to harm competition.

170.    Defendants' actions constitute horizontal market allocation and price-fixing agreements between actual and potential competitors and are illegal *per se* under state antitrust laws.

171.    Defendants' supracompetitive pricing constitutes a continuing violation of the laws of the states listed below in that each purchase by Plaintiff or a member of the Damages Class of supracompetitively priced Propranolol ER Caps and Propranolol Tabs caused injury to their business or property—and continues to do so.

172.    Defendants' conduct violated the following state laws:

(a)    Ala. Code § 6-5-60, with respect to purchases in Alabama by members of the Damages Class;

(b)    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by members of the Damages Class;

(c)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Damages Class;

(d)    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia by members of the Damages Class;

(e)    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Damages Class;

(f)    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii by members of the Damages Class;

(g)    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa by members of the Damages Class;

(h)    Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Damages Class;

(i)    Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Damages Class;

(j)    Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by members of the Damages Class;

(k)    Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Damages Class;

(l)    Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Damages Class;

(m)    Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by members of the Damages Class;

(n)    Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by members of the Damages Class;

(o)    Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada by members of the Damages Class;

(p)    N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by members of the Damages Class;

(q)    N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by members of the Damages Class;

(r)     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North

Carolina by members of the Damages Class;

(s)     N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North

Dakota by members of the Damages Class;

(t)     Or. Rev. Stat. §§ 6.46.705, *et seq.*, with respect to purchases in Oregon by

members of the Damages Class;

(u)     R.I. Gen. Laws §§ 6-36-1 *et seq.*, with respect to purchases in Rhode

Island by members of the Damages Class;

(v)     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in

South Dakota by members of the Damages Class;

(w)     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in

Tennessee by members of the Damages Class;

(x)     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah

by members of the Damages Class;

(y)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by

members of the Damages Class;

(z)     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West

Virginia by members of the Damages Class; and

(aa)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by

members of the Damages Class.

173.    Plaintiff and Damages Class Members have been and continue to be injured in

their business or property by Defendants' antitrust violations. Their injuries consist of: (1) being

denied free and open competition between competitors in the markets for Propranolol ER Caps

and Propranolol Tabs; and (2) paying higher prices for Propranolol ER Caps and Propranolol Tabs than they would have paid in the absence of Defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

174.    Plaintiff and Damages Class Members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

175.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and Damages Class Members.

176.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the above-listed state antitrust laws.

### THIRD CLAIM FOR RELIEF

**Unjust Enrichment**
**(By Plaintiff and Damages Class Members Against All Defendants)**

177.    Plaintiff incorporates the preceding paragraphs by reference.

178.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

179.    Defendants have benefited and continue to benefit from the overcharges on sales of Propranolol ER Caps and Propranolol Tabs made possible by the unlawful and inequitable acts alleged in this Complaint.

180.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for Propranolol ER Caps and Propranolol Tabs.

181.     Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and Damages Class Members.

182.     It would be futile for Plaintiff and Damages Class Members to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiff and Damages Class Members.

183.     It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Propranolol ER Caps and Propranolol Tabs, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

184.     The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Propranolol ER Caps and Propranolol Tabs is a direct and proximate result of Defendants' unlawful practices.

185.     The financial benefits Defendants derived rightfully belong to Plaintiff and Damages Class Members, who paid, and continue to pay, anticompetitive prices that inured to Defendants' benefit.

186.     It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for Propranolol ER Caps and Propranolol Tabs that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

187.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Damages Class.

188.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members.

189.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiff and Damages Class Members.

190.    Plaintiff and Damages Class Members have no adequate remedy at law.

## DEMAND FOR JUDGMENT

Accordingly, Plaintiff, on its own behalf and on behalf of the proposed Classes, demands judgment that:

A.    Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to members of the Classes under Rule 23(c)(2), and declares that Plaintiff is a proper representative of the Classes;

B.    Declares that Defendants' conduct violated Section 1 of the Sherman Act, the other state statutes set forth above, and the common law of unjust enrichment;

C.    Enjoins Defendants from continuing their illegal activities;

D.    Enters judgment against Defendants joint and severally and in favor of Plaintiff and the Classes;

E.    Grants Plaintiff and the Injunctive Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

F.      Awards the Plaintiff and the Damages Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.      Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed classes, demands a trial by jury on all issues so triable.

Dated: March 6, 2017

**FINE, KAPLAN AND BLACK, R.P.C.**

_____
ROBERTA D. LIEBENBERG
PAUL COSTA
ADAM J. PESSIN
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA
JAY L. HIMES
KARIN E. GARVEY
DOMENICO MINERVA
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005

Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
kgarvey@labaton.com
dminerva@labaton.com
mperez@labaton.com
rjulius@labaton.com

*Counsel for UFCW Local 1500 Welfare Fund
and the Proposed Classes*

F.      Awards the Plaintiff and the Damages Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.      Awards Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed classes, demands a trial by jury on all issues so triable.

Dated: March 6, 2017

**FINE, KAPLAN AND BLACK, R.P.C.**

ROBERTA D. LIEBENBERG
PAUL COSTA
ADAM J. PESSIN
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Tel: (215) 567-6565
Fax: (215) 568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA
JAY L. HIMES
KARIN E. GARVEY
DOMENICO MINERVA
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005